**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DAVID P. GOMEZ, PETER GOMEZ, SUSAN MEDINA, and ROBERT MARTINEZ, Individually, and on behalf of all others similarly situated, ) ) ) ) ) | Case No. 1:15-cv-3982 |

DAVID P. GOMEZ, PETER GOMEZ,          )
SUSAN MEDINA, and ROBERT               )
MARTINEZ, Individually, and            )
on behalf of all others similarly situated,  )      Case No. 1:15-cv-3982
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )      **CLASS ACTION COMPLAINT**
                                       )
TOP RANK, INC.,                        )
EMMANUEL DAPIDRAN PACQUIAO,            )
HOME BOX OFFICE, INC.,                 )
SHOWTIME NETWORKS, INC.,               )
MAYWEATHER PROMOTIONS, LLC,            )
FLOYD MAYWEATHER, JR.,                 )
AT&T, INC.,                            )
COMCAST CORPORATION,                   )
DirecTV, INC.                          )      **JURY TRIAL DEMANDED**
                                       )
          Defendants.                  )

**NATIONWIDE CLASS ACTION COMPLAINT**

1. Plaintiffs, DAVID P. GOMEZ, PETER GOMEZ, SUSAN MEDINA, and ROBERT MARTINEZ, ("Plaintiffs"), bring this class action complaint against Defendants, TOP RANK, INC., EMMANUEL DAPIDRAN PACQUIAO, HOME BOX OFFICE, INC., SHOWTIME, INC., MAYWEATHER PROMOTIONS, LLC, FLOYD MAYWEATHER, JR., DIRECTV, LLC, and AT&T U-VERSE ("Defendants"), individually, and on behalf of all others similar situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, who purchased the pay-per-view Floyd Mayweather v. Manny Pacquiao Boxing Match ("Fight"), in the range of $89.00 - $100.00, which took place on Saturday, May 2, 2015, at 10:00 p.m. Central Standard Time. Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for

allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge as to themselves and their own acts and experiences. By and through their counsel, Plaintiffs allege the following against Defendants:

## I. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides federal courts original jurisdiction over any class action in which any member of a class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million ($5,000,000.00), exclusive of interest and costs. Plaintiffs seek certification of a class of all persons who purchased the Fight during the Class Period. Such persons reside in the 50 United States and the District of Columbia.

3. The Court has personal jurisdiction over each Defendant. Each Defendant has conducted and does conduct business within the State of Illinois. Each Defendant contracts with Illinois entities and does business within the State of Illinois. Moreover, each Defendant, directly and/or through intermediaries (including distributors, retailers, and others), offered for sale, sold, and/or advertised the Fight in the United States and the State of Illinois. Each Defendant has purposefully and voluntarily placed the Fight into the stream of commerce with the expectation that it will be purchased by consumers in Illinois. The Fight was purchased by consumers in Illinois. Each Defendant intentionally availed itself of the Illinois market through its marketing and sales of the Fight in the State of Illinois and/or by having such other contacts with Illinois so as to render the exercise of jurisdiction over it by the Illinois court consistent with traditional notions of fair play and substantial justice.

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of

the events giving rise to the claim occurred in this judicial district.

5.  No other forum would be more convenient for the parties and witnesses to litigate this action.

## II. NATURE OF THE ACTION

6.  This is a putative class action on behalf of a nationwide class seeking redress for Defendants' deceptive practices in its marketing and advertising of the Fight.

7.  For the past six years, at least, consumers have been anticipating the fight between Floyd Mayweather and Manny Pacquiao, which was set to take place on Saturday May 2, 2015, at the MGM Grand in Las Vegas, Nevada, at 10:00 p.m. Central Standard Time.

8.  Defendants, individually and collectively, deceptively and fraudulently promoted, produced and sold the Fight as one between two healthy fighters, utilizing means including but not limited to television commercials, producing and broadcasting special television programming, giving interviews, distributing press releases, orchestrating a highly publicized weigh-in, and expressly misrepresenting the health of Manny Pacquiao to the Nevada State Athletic Commission, all in an effort to maximize and collect pay-per-view revenue.

## III. PARTIES

9.  Plaintiff, DAVID P. GOMEZ, PETER GOMEZ, SUSAN MEDINA, and ROBERT MARTINEZ are citizens of Illinois and reside in the Northern District of Illinois.

10. On May 2, 2015, Plaintiffs purchased the Fight on pay-per-view for between $89.00 - $100.00, plus fees and taxes.  Prior to purchasing the Fight, Plaintiffs viewed and specifically relied upon all of the representations made by Defendants including through radio, television, and print promotional efforts regarding the Fight.

11. Defendant, Top Rank, Inc., ("Top Rank"), is a domestic corporation, organized and existing under the laws of Nevada, with its corporate headquarters and principal place of business located at 748 Pilot Road, Las Vegas, Nevada 89119.  Top Rank is a citizen of Nevada.

12. Defendant, Manny Pacquiao, ("Pacquiao"), is an individual who is a foreign citizen doing business in Illinois, and whose residence is General Santos City, South Cotabato, Philippines.

13. Pacquiao does not maintain a registered agency within the State of Illinois.  The Philippines is not a party to the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, commonly referred to as the Hague Service Convention.  Nor is the Philippines a signatory to any treaty with the United States that would allow service of process through more traditional means.  Accordingly, service may be had upon Pacquiao by serving the Secretary of State for the State of Illinois via the Illinois Long-Arm Statute, 805 Ill. Comp. Stat. Ann. 180/1-50, due to Pacquiao's failure to appoint or maintain a registered agent within the State of Illinois.  805 Ill. Comp. Stat. Ann. 180/1-50(b)(1).

14. Defendant, Home Box Office, Inc., ("HBO"), is a foreign corporation, organized and existing under the laws of Delaware, with its corporate headquarters and principal place of business located at 1100 Avenue of the Americas, New York, New York, 10036.  HBO is a citizen of either New York and/or Delaware.

15. Defendant, Showtime, Inc., ("SHO"), is a domestic corporation, organized and existing under the laws of Delaware, with its corporate headquarters and principal place of business located at 1633 Broadway New York, New York 10019.  SHO is a citizen of either New

York and/or Delaware.

16. Defendant, Mayweather Promotions, LLC ("Mayweather Promotions"), is a domestic limited liability company, organized and existing under the laws of Nevada, with its corporate headquarters and principal place of business located at 4616 West Sahara Avenue, #290 Las Vegas, Nevada 89102. Mayweather Promotions is a citizen of Nevada.

17. Defendant, Floyd Mayweather, Jr., ("Mayweather"), is an individual and is a citizen of Nevada.

18. Defendant, DirecTV, LLC, ("DirecTV"), is a domestic limited liability company, organized and existing under the laws of California, with its corporate headquarters and principal place of business located at 2230 East Imperial Highway El Segundo, California 90245. DirecTV is a citizen of California.

19. Defendant, AT&T, INC.,, ("AT&T"), is a domestic corporation, organized and existing under the laws of Delaware, with its corporate headquarters and principal place of business located at 208 South Akard Street Dallas, Texas 75202. AT&T is a citizen of either Delaware and/or Texas.

20. Defendants were and are doing business within this Judicial District.

21. Defendants, upon becoming involved with the advertising, marketing, and sale of the Fight, knew or should have known that Defendants' representations regarding the Fight were false and misleading.

## IV.    FACTUAL ALLEGATIONS

22. For years, consumers have wanted Mayweather and Pacquiao, two of the very best pound-for-pound boxers in recent history, if not ever, to fight.

23. Mayweather was widely regarded as a calculated, defensive fighter with historically

conservative punch counts.

24. Pacquiao was widely regarded as an aggressive fighter with historically high punch counts, and was known for his effective and frequent right-jab.

25. Despite their differences in technique, both fighters had been considered and reported as the best "pound-for-pound" fighter in the world.

26. For years, since at least 2009, the two fighters and their representatives had unsuccessfully tried to arrange and schedule a fight.

27. Mayweather is currently under contract with SHO. For years, SHO has produced and broadcasted programming promoting Mayweather.

28. Pacquiao is currently under contract with HBO. For years, HBO has produced and broadcasted programming promoting Pacquiao.

29. Until January 2015, it was believed that the fight would never occur. On January 27, 2015, Mayweather and Pacquiao both attended the Miami Heat vs. Milwaukee Bucks game in Miami, Florida. Their attendance, and discussion during the game, was broadcast and reported as news around the world. The mere sight of them talking renewed interest in a potential fight. With that chance meeting, public interest in the fight was renewed.

30. Three weeks later, on and around February 20, 2015, Mayweather announced, via social media, that he was finally going to fight Pacquiao. Mayweather's announcement was broadcast and reported around the world. Public interest grew. The details were still being worked out.

31. The promoters, Mayweather Productions and Top Rank, and their respective fighters, Mayweather and Pacquiao, and others, executed a term sheet, but not a final contract, between February 20, 2015 and April 15, 2015. The Fight was scheduled and announced

to take place on May 2, 2015, at the MGM Grand Hotel & Casino in Las Vegas, Nevada.

32. Despite a final contract not being signed, both HBO and SHO produced and broadcast special programming documenting both Mayweather's and Pacquiao's training, with the purpose of promoting the Fight and maximizing pay-per-view purchases.

33. At the time the Fight was first announced, it was reported and believed that it was going to be the largest grossing fight, in terms of pay-per-view revenue, in the history of boxing.

34. At all times since the Fight was announced, up until the opening bell of the first round, Mayweather was the favorite and Pacquiao was the underdog.

35. As of April 15, 2015, the final contract for the fight was still not signed, and the proposed contract was reported not to include Pacquiao's promotor, Top Rank, as a signee or party to the contract.

36. On or around April 22, 2015, it was reported that the contract was finally signed by all parties, including Top Rank, and that tickets would finally go on sale on April 23, 2015.

37. In addition, the fight would be distributed via pay-per-view, for a cost of between $89.99 and $99.99, plus fees and taxes, through various cable providers, including but not limited to Defendants AT&T (including "AT&T U-Verse") and DirecTV.

38. In full force and effect at all times that the fight was promoted and scheduled were the following statutory provisions:

> **NAC 467.875  Solicitation to conduct fraudulent contest or exhibition: Duty of licensee to report such solicitation immediately; disciplinary action for failure to report.** (NRS 467.030)   When any person who is licensed by the Commission is approached with a request or suggestion that a contest or exhibition not be conducted honestly, that person must immediately report the matter to the Commission. Failure to do so is a ground for disciplinary action. [Athletic Comm'n, § 146, eff. 4-25-78]—(NAC A 11-2-88; 12-2-97).

**NAC 467.885   Grounds for disciplinary action.** (NRS 467.030) The Commission may suspend or revoke the license of, otherwise discipline or take any combination of such actions against a licensee who has, in the judgment of the Commission:

1. Violated the laws of Nevada, except for minor traffic violations;
2. Violated any provision of this chapter;
3. Provided false or misleading information to the Commission or a representative of the Commission;
4. Failed or refused to comply with a valid order of a representative of the Commission;
5. Conducted himself or herself at any time or place in a manner which is deemed by the Commission to reflect discredit to unarmed combat;
6. Knowingly dealt or consorted with any person who:
   a. Has been convicted of a felony;
   b. Engages in illegal bookmaking;
   c. Engages in any illegal gambling activity;
   d. Is a reputed underworld character;
   e. Is under suspension from any other Commission; or
   f. Is engaged in any activity or practice that is detrimental to the best interests of unarmed combat; or
7. Had personal knowledge that an unarmed combatant suffered a serious injury during training for a contest or exhibition and failed or refused to inform the Commission about that serious injury.
   [Athletic Comm'n, § 152, eff. 4-25-78]—(NAC A 12-2-97; R083-00, 9-22-2000; R090-07, 12-4-2007).

**NAC 467.886   Licensees prohibited from engaging in activities that bring disrepute to unarmed combat.** (NRS 467.030) A person licensed by the Commission shall not engage in any activity that will bring disrepute to unarmed combat, including, but not limited to, associating with any person or entity if such an association brings disrepute to unarmed combat.  (Added to NAC by Athletic Comm'n, eff. 12-2-97).

39. From the time the fight was announced by Mayweather on February 20, 2015, through the

date of the fight, all Defendants actively promoted the Fight, including labeling the Fight

as the "Fight of the Century," all for the purpose of increasing and maximizing the number of pay-per-view purchases of the Fight.

40. At all times, and through all Defendants' promotional efforts, it was represented that Pacquiao was healthy and uninjured, including by and through frequent commercials run on HBO and SHO, the special television programming broadcast by HBO and SHO, the continued labeling of the Fight as the "Fight of the Century," numerous interviews given by representatives and employees of HBO, SHO, Top Rank, Pacquiao, Mayweather Productions, and Mayweather, all for the purpose of increasing and maximizing pay-per-view purchases of the Fight.

41. In the days and weeks prior to the fight, Pacquiao, by and through his promoter, Top Rank, represented to the Nevada State Athletic Commission, that Pacquiao was healthy and that he was not suffering from any injuries. Attached is a "Pre-Fight Medical Questionnaire" completed by Pacquiao attesting to his health and confirming that he had not suffered any injury to his shoulder that needed evaluation or examination. *See* Exhibit A.

42. At no time before the fight began did any defendant provide, release, or disclose any information that Pacquiao was injured or had been injured during training.

43. If Defendants had informed the Nevada State Athletic Commission of Pacquiao's injury, that information would have then been disseminated to the public through numerous media outlets and channels, and available to Plaintiffs and all members of the putative class.

44. Unbeknownst to pay-per-view purchasers of the Fight, Pacquiao had injured his right shoulder during a sparring session on or about April 4, 2015 and had been evaluated and examined on and around April 6, 2015, including obtaining an MRI.

45. Unbeknownst to pay-per-view purchasers of the Fight, immediately prior to the Fight

Pacquiao requested a shot in his right shoulder that was denied by the Nevada State Athletic Commission based, in whole or in part, on Pacquiao and Top Rank's misrepresentation(s) that Pacquiao had not suffered any prior injury.

46. The facts that Pacquiao suffered an injury to his right shoulder during training and was suffering from that right shoulder injury immediately before and during the fight was only made public after the Fight had been fought and won by favorite, Mayweather.

47. The facts that Pacquiao suffered an injury to his right shoulder during training and was suffering from that right shoulder injury immediately before and during the fight was only made public after the Fight had been purchased and watched, via pay-per-view, by viewers throughout the United States.

48. Shortly after the Fight, Top Rank CEO, Robert Arum, reported that the injury was the same as the one that Los Angeles Laker Kobe Bryant suffered, a torn rotator cuff.

49. Following the Fight, Pacquiao estimated that his right shoulder was at 60% during the Fight.

50. Following the Fight, Pacquiao stated that he thought the Fight was going to be rescheduled based on the nature and extent of his right shoulder injury.

51. At the time Pacquiao was initially evaluated for the injured right shoulder, Pacquiao was recommended to rest for 30-to-40 days.

52. At the time Pacquiao injured his right shoulder on or around April 4, 2015, the contract for the Fight had not been executed.

53. At the time Pacquiao injured his right shoulder on or around April 4, 2015, tickets for the Fight had not yet been sold.

54. At the time Pacquiao injured his right shoulder on or around April 4, 2015, no consumers

had purchased the Fight via pay-per-view.

55. After Pacquiao injured his right shoulder, various Defendants in this matter initiated legal action to protect their broadcasting rights to the Fight and limit or eliminate on-line streaming of the Fight, in furtherance of maximizing the number of pay-per-view purchases and, consequently, their own profits.

56. Before Pacquiao injured his right shoulder, it was estimated that both fighters would receive in excess of $100 million for their participation in the bout, based largely on the anticipated pay-per-view audience.

57. If at any time before the Fight it had been revealed that Pacquiao injured his right shoulder on April 4, 2015, while training for the Fight, that he had his right shoulder evaluated and examined, that he required injections into his right shoulder prior to the fight, or anything that could potentially compromise Pacquiao's ability to compete in the Fight, would have been widely broadcasted and reported throughout the United States and the world.

58. At all times before purchasing the Fight via pay-per-view, Plaintiffs, DAVID P. GOMEZ, PETER GOMEZ, SUSAN MEDINA, and ROBERT MARTINEZ, justifiably relied on the representations of Defendants that both Floyd Mayweather, Jr., and Manny Pacquiao were healthy and able to compete at full strength and were not limited by any specific injury that had been previously evaluated and examined.

59. At any time before purchasing the Fight via pay-per-view, had Plaintiffs, DAVID P. GOMEZ, PETER GOMEZ, SUSAN MEDINA, ROBERT MARTINEZ, and all other putative class members, known that Pacquiao, the underdog, had been injured, or suffered a torn right rotator cuff during training, or had been recommended to rest for 30 to 40 days beginning on and around April 6, 2015, or that his right arm was at an estimated 60%, they

would not have purchased the Fight via pay-per-view for $89.00 - $100.00.

60. If any of Defendants, between April 4, 2015 and May 2, 2015, had disclosed that Pacquiao, the underdog, had injured his right shoulder, or had suffered a torn right rotator cuff during training, or had been recommended to rest for 30 to 40 days beginning on and around April 6, 2015, or that his right arm was at an estimated 60% of full functioning, they would not have realized the number of pay-per-view purchases they were anticipating.

61. If the Fight was cancelled, delayed or rescheduled, because of the injury to Pacquiao's right shoulder, Defendants knew that they would not collect the pay-per-view revenue they were anticipating, if at all.

62. Defendants, individually and collectively, represented at all times up until the Fight began that Pacquiao was healthy, despite having knowledge to the contrary, in order to maximize the number of pay-per-view purchases and maximize their own profits.

63. Defendants, individually and collectively, withheld and did not disclose that Pacquiao suffered a right shoulder injury while training for the May 2, 2015 Fight, in order to maximize the number of pay-per-view purchases and maximize their own profits.

64. Plaintiffs and class members have suffered damages proximately caused by Defendants' willful concealment of the subject injury and the misrepresentation that each fighter was perfectly healthy when, in fact, Defendants had prior knowledge that Pacquiao had a physical impairment which would prohibit a competitive fight. Stated simply, the damages include the obvious fact that Plaintiff and class members have been the victim of a "bait and switch" -- they thought they were genuinely buying an opportunity to view an extraordinary sporting event when, in fact, there were key facts that undermined the integrity of the fight and the value of Plaintiff's purchase to view that fight.

## V.     CLASS ALLEGATIONS

65. Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 individually and on

behalf of the following nationwide consumer class (the "Class"):

> All consumers who purchased the pay-per-view Fight on or about May 2, 2015.
>
> Specifically excluded from this Class are Defendants; the officers, directors or
>
> employees of Defendants; any entity in which Defendants have a controlling
>
> interest; and any affiliate, legal representative, heir or assign of Defendants; also
>
> excluded are any federal, state, or local governmental entities, any judicial officer
>
> presiding over this action and the members of his/her immediate family and judicial
>
> staff, and any juror assigned to this action.

66. The Class is sufficiently numerous, as it includes thousands of persons who have purchased

the Fight.  Thus, joinder of such persons in a single action or bringing all members of the

Class before the Court is impracticable for purposes of Rule 23(a)(1) of the Federal Rules

of Civil Procedure.  The disposition of the Class members' claims in this class action will

substantially benefit both the parties and the Court.

67. The Class is readily ascertainable through Defendants' business records and other available

documentation.  Notice can be provided to Class members by publication of notice by

internet, radio, newspapers, and magazines.

68. There are questions of law and fact common to the Class for purposes of Federal Rule of

Civil Procedure 23(a)(2).  Defendants' advertising, marketing, and promotional practices

were supplied uniformly to all members of the Class, so that the questions of law and fact

are common to all members of the Class.  All Class members were and are similarly

affected by having purchased the Fight for their intended and foreseeable purpose as

promoted, marketed, and advertised by Defendants as set forth in detail herein, and the relief sought herein is for the benefit of Plaintiffs and other members of the Class.

69. Plaintiffs assert claims that are typical of the claims of the entire Class for purposes of Federal Rule of Civil Procedure 23(a)(3). Plaintiffs and all Class members have been subjected to the same wrongful conduct because they purchased the Fight, which did not possess the attributes that Defendants represented. Plaintiffs and the Class have thus all overpaid for the Fight and/or purchased the Fight that they otherwise would not have.

70. Plaintiffs will fairly and adequately represent and protect the interests of the other Class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have no interests antagonistic to those of other Class members. Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel experienced in litigation of this nature to represent them. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

71. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Defendants' advertising, marketing, and promotional practices were supplied uniformly to all members of the Class.

72. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact substantially predominate over any questions that may affect only individual members of the Class. Among these common questions of law and fact are:

   a. Whether Defendants misrepresented or omitted material facts in connection with

the promotion, marketing, advertising, and sale of the Fight;

b.  Whether Defendants misrepresented that the Fight would have characteristics that it does not have;

c.  Whether Defendants' acts and practices in connection with the promotion; marketing, advertising, and sale of the Fight violated the Illinois Consumer Fraud and Deceptive Business Practices Act, and other similar, cited statutes;

d.  Whether Defendants' conduct, as set forth herein, injured members of the Class and whether they have been damaged by the wrongs complained of herein, and if so, the measure of those damages and the nature and extent of other relief that should be provided.

73.  Proceeding as a class action provides substantial benefits to both the parties and the Court because this is the most efficient method for the fair and efficient adjudication of the controversy.  Class members have suffered and will suffer irreparable harm and damages as a result of Defendants' wrongful conduct.  Because of the nature of the individual Class members' claims, few, if any, could or would otherwise afford to seek legal redress against Defendants for the wrongs complained of herein, and a representative class action is therefore appropriate, the superior method of proceeding, and essential to the interests of justice insofar as the resolution of Class members' claims is concerned.   Absent a representative class action, Class members would continue to suffer losses for which they would have no remedy, and Defendants would unjustly retain the proceeds of its ill-gotten gains.  Even if separate actions could be brought by individual members of the Class, the resulting multiplicity of lawsuits would cause undue hardship, burden and expense for the Court and the litigants, as well as create a risk of inconsistent rulings which might be

dispositive of the interests of the other Class members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

## CAUSES OF ACTION

**VI.    VIOLATIONS OF STATES' CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT AGAINST ALL DEFENDANTS**

74. Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 73, as if fully set forth herein.

75. Plaintiffs bring Count VI individually and on behalf of all similarly situated residents of each of the 50 states and the District of Columbia for violations of the respective statutory consumer protection laws, as follows:

   a.   The Alabama Deceptive Trade Practices Act, Ala. Code 1975, § 8-19-1, *et seq.*;

   b.   The Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, *et seq.*;

   c.   The Arizona Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.*;

   d.   The Arkansas Deceptive Trade Practices Act, Ark. Code §§ 4-88-101, *et seq.*;

   e.   The California Unfair Competition Law, Bus. & Prof. Code §1750 *et seq.*;

   f.   The California Consumers Legal Remedies Act, Civil Code §1750, *et seq.*;

   g.   The Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;

   h.   The Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq.*;

   i.   The Delaware Consumer Fraud Act, 6 Del. C. § 2513, *et seq.*;

   j.   The D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

   k.   The Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, *et seq.*;

   l.   The Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

   m.   The Hawaii Unfair Competition Law, H.R.S. §480-1, *et seq.*;

n. The Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

o. The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq.*;

p. The Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*;

q. The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. §714H.1, *et seq.*;

r. The Kansas Consumer Protection Act, K.S.A., § 50-623, *et seq.*;

s. The Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;

t. The Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

u. The Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq.*;

v. The Maryland Consumer Protection Act, MD Code, Commercial Law, §13-301, *et seq.*;

w. The Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq.*;

x. The Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq.*;

y. The Minnesota Prevention of Consumer Fraud Act, Minn.Stat. § 325F.68, *et seq.*;

z. The Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

aa. The Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq.*;

bb. The Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq.*;

cc. The Nebraska Consumer Protection Act, Neb. Rev.St. §§ 59-1601, *et seq.*;

dd. The Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq.*;

ee. The New Hampshire Regulation of Business Practices for Consumer Protection N.D.Rev.Stat. §358-A:1, *et seq.*;

ff. The New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq.*;

gg. The New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, *et seq.*;

hh. The New York Consumer Protection from Deceptive Acts and Practices, N.T. GBL (McKinney) § 349, *et seq.*;

ii. The North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. §75-1.1, *et seq.*;

jj. The North Dakota Consumer Fraud Act, N.D. Cent. Code Chapter 51-15, *et seq.*;

kk. The Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq.*;

ll. The Oklahoma Consumer Protection Act, 15 O.S.2001 §§ 751, *et seq.*;

mm. The Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.*;

nn. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

oo. The Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq.*;

pp. The South Carolina Unfair Trade Practices Act, SC Code 1976, § 39-5-10, *et seq.*,

qq. The South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq.*;

rr. The Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.*;

ss. The Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq.*;

tt. The Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq.*;

uu. The Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

vv. The Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, *et seq.*;

ww.      The Washington Consumer Protection Act, RCWA 19.86.010, *et seq.*;

xx. The West Virginia Consumer Credit Ad Protection Act, W.Va. Code § 46A-1-101, *et seq.*;

yy. The Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq.*; and,

zz. The Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq.*

76. Defendants' foregoing misrepresentations, concealment, suppression and omission of material facts, individually and collectively, as set forth above, including that Manny Pacquiao was healthy for the Fight, are deceptive and/or unfair acts or practices prohibited by the consumer fraud statutes as set forth above.

77. Defendants, individually and collectively, intended to be deceptive and/or unfair to Plaintiffs and the putative class by promoting and disseminating information that Pacquiao was healthy leading up to and entering the Fight, intentionally making false and misleading statements while omitting accurate statements as alleged above, because had Defendants, individually or collectively, disclosed or provided accurate information that Pacquiao suffered an injury or any information related to the nature and extent of that injury, Plaintiffs and the putative class members would not have purchased the "Fight of the Century", via pay-per-view, distributed by various and numerous cable providers throughout the country.

78. Defendants' promotional efforts, including but not limited to those identified above, contained false and misleading statements and representations, for the purpose of increasing and maximizing pay-per-view purchases of the Fight, including to Plaintiffs and

the putative class, are both an unfair act and deceptive practice prohibited by the foregoing statutes.

79. Defendants intended to be deceptive and unfair to Plaintiffs and the putative class by unlawfully representing that Pacquiao was healthy.

80. Defendants, individually and collectively intended that Plaintiffs and the putative Class members rely on the Defendants' misrepresentations, concealments, and suppression and omission of material facts, regarding Pacquiao's health,

81. Plaintiffs and the putative Class members justifiably relied to their detriment on the foregoing misrepresentations and omissions of material facts by Defendants when purchasing, via pay-per-view, the Fight labeled and promoted as the "Fight of the Century."

82. The above-described deceptive and unfair acts and practices were used or employed in the conduct of trade or commerce, namely, the sale of the Fight, via pay-per-view, to Plaintiffs and the putative Class members.

83. The above-described deceptive and unfair acts offend public policy and caused substantial injury to consumers.

84. As a direct and proximate result of the foregoing, the Plaintiffs and the putative Class members have been damaged in an amount to be determined at trial.

## VII. NEGLIGENT MISREPRESENTATION AGAINST TOP RANK, MAYWEATHER PRODUCTIONS, HBO, AND SHO

85. Plaintiffs reiterate the allegations contained in paragraphs 1 through 73 above, as if fully set forth herein.

86. At all times, Defendants Top Rank, Mayweather Productions, HBO, and SHO were in the business of distributing, disseminating, and supplying information promoting boxing matches, including the Fight between Mayweather and Pacquiao that occurred on May 2,

2015, to consumers including Plaintiffs and all Class members, with the intent and purpose of increasing and maximizing the number of consumers that purchased the event via pay-per-view.

87. At all times, Defendants Top Rank, Mayweather Productions, HBO, and SHO were in the business of distributing, disseminating, and supplying information related to the various boxing matches that they promoted, produced and broadcast, including but not limited to the Fight between Mayweather and Pacquiao that occurred on May 2, 2015, that included information regarding the fighters' backgrounds, records, strengths, weaknesses, and overall ability to compete at a high level during the Fight, to assist and influence consumers when deciding whether to purchase the Fight via pay-per-view.

88. At all times Defendants Top Rank, Mayweather Productions, HBO, had SHO had a duty to exercise reasonable care when making disclosures and representations about the fighters' backgrounds, records, strengths, weaknesses, health, and overall ability to compete at a high level.

89. Defendants Top Rank, Mayweather Productions, HBO, and SHO further had a duty to provide potential pay-per-view purchasers, including Plaintiffs and all potential Class members, with information that reflected the true health and ability of the participating fighters to compete at their highest level and to exercise reasonable care in promoting the Fight.

90. Defendants Top Rank, Mayweather Productions, HBO, and SHO each breached its duties to Plaintiffs and all potential Class members in one or more of the following respects:

    a. Failed to determine and disclose, even though it knew or should have known, that Pacquiao had injured his right shoulder during training to the extent that it had to

be evaluated and examined, including but not limited to an MRI;

b.  Continued to promote the Fight as though both fighters were healthy and without injury that would or could compromise their ability to compete at their highest level;

c.  Failed to disclose that Pacquiao was going to require and request injection(s) into his right shoulder within hours of the beginning of the fight;

d.  Failed to disclose that Pacquiao suffered an injury to his right shoulder that would impair his ability to compete with boxer Mayweather;

e.  Failed to disclose that Pacquiao suffered an injury to his right shoulder that would severely impair, and potentially eliminate, his ability to win the May 2, 2015, Fight with boxer Mayweather.

f.  Promoted and continued to promote the Fight as "The Fight of the Century" even though it knew that Pacquiao was injured and likely unable to compete with boxer Mayweather.

91. As a direct and proximate result of one or more of the foregoing negligent misrepresentations, Plaintiffs and the members of the Class have suffered damages.

## VIII.   UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

92. The allegations of Paragraphs 1 through 73 are incorporated herein.

93. Through the deceptive promotional tactics and misrepresentations described above, Defendants promoted, marketed and sold to consumers, via pay-per-view, the Fight between Mayweather and Pacquiao on May 2, 2015, by means of fraudulent, deceptive and/or negligent misrepresentations.

94. The object and intention of Defendants' scheme was not only to sell said pay-per-view

purchases, but also to assure and collect certain profits for Defendants.

95. The portion of the pay-per-view cost illegally paid to and distributed amongst Defendants came directly from the cash and/or checking accounts of Plaintiffs and all potential Class members. On information and belief in excess of three-hundred million dollars ($300,000,000.00) was retained by Defendants and, therefore, caused an equal detriment in excess of three hundred million dollars detriment to the class members.

96. As the pay-per-view purchases were obtained/induced by improper means, Defendants, individually and collectively, are not legally or equitably entitled to retain any of the profits it realized from the revenue generated by the pay-per-view sale of the Fight.

97. Defendants, individually and collectively, breached the public trust by selling the Fight via pay-per-view, through illegal means to the detriment of Plaintiffs and the putative Class.

98. By its actions in taking and withholding said monies, Plaintiffs and the putative Class conferred, and continue to confer, a benefit upon all Defendants, and Defendants are aware of such benefit.

99. By Defendants improper and wrongful taking and withholding of the Plaintiffs' and the putative Class' monies, Defendants were and are financially unjustly enriched, on information and belief, in excess of three-hundred million dollars ($300,000,000.00), causing an economic detriment of in excess of three hundred million dollars ($300,000,000.00) to the Plaintiffs and putative Class.

100. Defendants' retention of said benefit violates the fundamental principles of justice, equity, and good conscience.

101. Moreover, Plaintiffs and the putative Class seek a remedy wherein Defendants, individually and collectively, are required to refund its ill-gotten gains.

102.     Defendants have been enriched, and it would be unjust for Defendants to retain the enrichment, which were secured through illegal and improper means. As such, Defendants must be ordered to pay restitution and disgorge the ill-gotten gains.

103.     Under Illinois law, a claim for unjust enrichment is proper and properly pled as an independent cause of action.

104.     As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs and the putative Class have suffered a detriment in an amount estimated to be in excess of three-hundred million dollars ($300,000,000.00), and to be determined more precisely at trial.

## IX.     PRAYER

WHEREFORE, Plaintiffs, Individually, and on behalf of all others similarly situated, pray for judgment against Defendants as follows, ON ALL CAUSES OF ACTION:

105.     For an order declaring this action to be a proper nation-wide class action and requiring Defendants to bear the cost of class notice;

106.     Or in the alternative, for an order declaring this action to be a proper Illinois-wide class action and requiring Defendants to bear the cost of class notice;

107.     For an order enjoining Defendants from continuing the unlawful practices set forth above;

108.     For an order compelling Defendants to destroy all misleading and deceptive advertising materials and products;

109.     For an order requiring Defendants to disgorge and make restitution of all monies, revenues, and profits Defendants acquired by means of the unlawful practices set forth above;

110.     For compensatory damages;

111.     For statutory and punitive damages;

112.     Costs, expenses, and reasonable attorneys' fees;

113.     For pre-judgment and post-judgment interest; and

114.     For all such other and further relief as the Court may deem just and proper

## JURY DEMAND

115.     Plaintiffs demand a trial by jury on all causes of action so triable.

DATED:  May 5, 2015


RESPECTFULLY SUBMITTED,                    RESPECTFULLY SUBMITTED,


By:_/s/ Robert R. Duncan_____          By:_/s/ Thomas C. Cronin_____
        Robert R. Duncan                           Thomas C. Cronin
        Duncan Law Group, LLC                       Cronin & Co., Ltd.
        161 N. Clark, Suite 2550                    161 North Clark Street
        Chicago, IL 60601                           Suite 2550
        Tel: (312) 202-3283                         Chicago, Illinois 60601
        Fax: (312) 202-3284                         Tel: 312-201-7100
        rrd@duncanlawgroup.com                      Fax: 312-201-7101
        IL State Bar: 6277407                       tcc@cronincoltd.com
        Attorney for Plaintiffs                     Attorney for Plaintiffs


RESPECTFULLY SUBMITTED,


By:_/s/ Michael S. Agruss_____
        Michael S. Agruss
        SBN: 6281600
        Agruss Law Firm, LLC
        4619 N. Ravenswood Ave.
        Suite 303A
        Chicago, IL 60640
        Tel: 312-224-4695
        Fax: 312-253-4451
        michael@agrusslawfirm.com
        Attorney for Plaintiffs

# EXHIBIT A

*135/14*

## PRE-FIGHT MEDICAL QUESTIONNAIRE

**Contestant's Name** *Emmanuel D. Pacquiao*  **Age** *36*

Yes ( ) No (✓) Have you had an MRI/MRA or CT scan of the head for any reason other than state licensing?  If yes, explain _____

Yes ( ) No (✓) Have you ever had any eye problems, surgery (*Lasik, PRK*), or special examinations? If yes, explain _____

Yes ( ) No (✓) Have you had any eye problems or eye issues since your annual exam was done? If yes, explain _____

Yes ( ) No (✓) Do you have any serious medical illnesses, diseases, conditions, or allergies of any kind? If yes, explain _____

Yes ( ) No (✓) Have you had any broken bones in last 6 months? If yes, explain _____

Yes ( ) No (✓) Have you had any injury to your shoulders, elbows, or hands that needed evaluation or examination? If yes, explain _____

Yes ( ) No (✓) Have you had any injury to your knees, ankles, or feet that needed evaluation or examination? If yes, explain _____

Yes ( ) No (✓) Have you had any lacerations or cuts that required sutures or glue in the last 3 months? If yes, explain _____

Yes ( ) No (✓) Have you had any surgeries?  If yes, explain _____

Yes (✓) No ( ) Have you taken or received *any* medication, drug, cream, inhalant, or injection, whether prescription, over-the-counter, from anyone or anyplace, in the last month?  If yes, explain *Lidocaine, bupivacaine, Celestone, PPP, Toradol*

Yes ( ) No (✓) Have you taken or received *any* nutritional supplement or vitamin in the last month? If yes, explain _____

Yes ( ) No (✓) Have you taken or received *any* medication, drug, supplement, cream, inhalant, or pill to help you lose weight or cut water for this bout? If yes, explain _____

Yes ( ) No (✓) Have you suffered a KO, TKO, or any kind of loss of consciousness in the last 6 months during a bout, sparring, or any other activity?  If yes, explain _____

What was your weight 2 weeks ago? *145*  What was your weight 1 week ago? *146*

When was your last bout, and what was the result of that bout? *11-23-14  W UD12*

I hereby swear, under penalty of perjury, that the above information is true and correct to the best of my knowledge.

_____  _____
Contestant's signature     *Mike Koncz*  Second's signature and name

NSAC Physician conducting this Evaluation: _____ on *5/1*, 2015

Revised-11/14