BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTI-DISTRICT LITIGATION

| | |
|---|---|
| In re: Top Rank Pay-Per-View Sales Practices Litigation | MDL No. |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF JEREMY TJADEN'S MOTION FOR TRANSFER OF
RELATED ACTIONS TO THE CENTRAL DISTRICT OF CALIFORNIA
FOR COORDINATED OR CONSOLIDATED PRETRIAL
PROCEEDINGS PURSUANT TO 28 U.S.C. §1407

Pursuant to 28 U.S.C. §1407 and the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiff Jeremy Tjaden ("Plaintiff"), represented by Zimmerman Reed, PLLP and Ridout Lyon + Ottoson LLP, respectfully submits this Memorandum of Law In Support of his Motion for Transfer and Centralization of the Related Federal Actions to the Central District of California. Plaintiff is the putative representative of the class alleged in *Tjaden v. Top Rank, Inc., et al.*, No. 15-cv-03419, (*"Tjaden"*), pending in the Central District of California.

This litigation involves the defendants' common scheme surrounding the intentional and fraudulent omissions relating to injuries suffered by Defendant Emmanuel "Manny" Pacquiao ("Pacquiao") prior to the fight between Pacquiao and Floyd Mayweather, Jr. ("Mayweather") held May 2, 2015, in Las Vegas, Nevada (the "Fight"). Plaintiffs in these related cases each seek to represent a putative class of persons who paid money to watch the Fight, which is conservatively estimated to have brought in over $300 million in PPV sales alone.

The Fight was billed to the American (and worldwide public) as the "Fight of The Century." However, the Fight is now instead being referred to

as the "Fraud of the Century" because Pacquiao, and other defendants, intentionally failed to disclose a shoulder injury that they were aware of in advance of the Fight as required, therefore, allowing Pacquiao to enter the Fight injured and unable to fully perform. This injury was unbeknownst to the public, including plaintiffs in the related actions and the various classes.

Each and every related action discussed below contains allegations that defendants intentionally concealed the injury from the public. By failing to disclose that Pacquiao was injured prior to the Fight, while still promoting and advertising the Fight to plaintiffs and members of the classes and the public as a fair and honest sporting event between two healthy and uninjured participants, plaintiffs and the members of the classes represented in the Related Federal Actions were deprived of what they paid for and injured financially.

As Leigh Steinberg's commentary in *Forbes* on May 5, 2015 explains, as a result of the defendants' failure to disclose the known injury to Pacquiao, while representing and/or implying the opposite to the public, "The paying public was fleeced."

> Manny Pacquiao revealed after the fight that he had a damaged shoulder which he knew about for some time. He tore his rotator cuff, which seriously impacts the ability to throw punches. Each boxer has to sign a form stating all injuries that he knows about. Had the Nevada Athletic Commission been aware of the injury, they likely would have postponed the fight. Pacquiao asked for a painkiller combination to be injected just hours prior to the bout–the commission refused to allow this, even though it was non-narcotic, because they deemed it too close to the fight. Cisco Aguilar, the Nevada Athletic Commission chairman told the Daily News, "You don't want them to be masking the pain. If they're masking the pain, they are potentially going to have some long-term damage that they may not have had."

> Final Pay-per-view buys have not yet been revealed. A conservative three million buys would have generated $300 million in revenue. That means that Mayweather made $180 million and Pacquiao made $120 million for a fight that did not pit two healthy fighters. The public was not told and tickets went for absurdly high amounts of money. The pay-per-view charge for HD was $100 per household, significantly higher than any prior fight. The paying public was fleeced.

Steinberg, "Mayweather-Pacquiao Fight: "Fraud of The Century," *Forbes*, May 5, 2015, http://www.forbes.com/sites/leighsteinberg/2015/05/05/mayweather-pacquiao-fight-fraud-of-the-century/. *USA Today* further commented on May 5, 2015:

> This is worse than simply underperforming. This is stupidity incarnate, and truly confirms that this fight was only about the money.
>
> A prime Pacquiao doesn't set a single foot into that ring May 2 if he's carrying such a significant injury. He doesn't put his record, reputation, or health on the line against a tomato can, never mind an undefeated Mayweather. No, the Pacquiao of old would have put the fight on hold and allowed himself the nine months it would have taken to heal from surgery.
>
> That's what a fighter with a desire to win would have done. That's what any competitor would have done. But by fighting anyway, Pacquiao made the decision to take the loss and the money now. On the Friday leading up to the fight, Pacquiao was asked by a Nevada State Athletic Commission in a pre-fight examination and questionnaire whether he had any injuries to his shoulders, elbows, or hands that would require examination.
>
> Pacquiao checked "no" and into the ring he went.
>
> Winning wasn't important. How could you argue otherwise? If it was, he wouldn't have fought. It's simple as that. But Pacquiao did fight, and his injury affected his signature right hook so severely that he threw approximately 400 fewer punches than normal.
>
> It wasn't a heroic performance. It wasn't gritty or determined.
>
> It was stupid, wasteful, and disingenuous.

Foss, "Manny Pacquiao's Stupid Decision Cost Us the Fight of the Century," *USA Today*, May 5, 2015, http://ftw.usatoday.com/2015/05/many-pacquiao-rotator-cuff-injury-floyd-mayweather-fight-stupid-dumb-why.

Based on the foregoing, the related actions discussed below all seek restitution, damages and other relief for class members who paid for a fight that was promoted and advertised as a legitimate and fair sporting event between fit and able opponents, but were denied that after parting with their money because Pacquiao and other defendants failed to disclose injuries they were aware of. The truth was intentionally concealed from the public by defendants in an attempt to maximize PPV and other fight revenue for them and so not to cause a delay or jeopardize the resulting payday to Pacquiao and defendants if the truth became known the participants purses were tied to PPV sales providing the financial incentive to keep quiet about the injury and increase sales.

Defendants' factual omissions and concealments regarding the existence of the injury Pacquiao suffered prior to the Fight were material as reasonable persons in the position of Class member would have wanted to know about the injury prior to the Fight so they could determine whether to part with their money to view the Fight, or if already purchased, to demand a refund or postponement because of the circumstances. Had the public and the media been made aware of the truth about Pacquiao's inferior condition and the injury before the Fight, the pressure to cancel or postpone the Fight, and provide refunds, would have been astronomical and Defendants' could not have credibly continued to attempt stage the Fight on May 2, 2015.

In all, ten (10) actions have been filed in the United States District Courts against various defendants with regard to this fraudulent omission and deceptive advertising discussed above: *Tjaden v. Top Rank, Inc., et al.*, No. 15-cv-03419, ("*Tjaden*"), pending in the Central District of California; *Mahoney v. Pacquiao, et al.*, No. 15-cv-3376 (C.D. Cal.) ("*Mahoney*") pending in the Central District of California; V*anel, et al., v. Pacquiao, et al.*, No. 15-cv-00842 (D. Nev.) ("*Vanel*") pending in the District of Nevada; *Neidl v. Top Rank, Inc., et al.*, No. 15-cv-00849 (D. Nev.) ("*Neidl*") pending in the District of Nevada; *Gomez, et al. v. Top Rank, Inc., et al.*, No. 15-cv-03982 (N.D. Ill.) ("*Gomez*") pending in the Northern District of Illinois; *Craig v. Pacquiao, et al.*, No. 15-cv-00629 (E.D. Tex.) ("*Craig*") pending in the Eastern District of Texas; *Bobadilla v. Top Rank, Inc., et al.*, No. 15-cv-03187 (D.N.J.) ("*Bobadilla*") pending in the District of New Jersey; *Johnson, et al. v. Pacquiao, et al.*, No. 15-cv-01307 (D. Md.) ("*Johnson*") pending in the District of Maryland; *Barrios v. Pacquiao, et al.*, No. 15-cv-02606 (E.D.N.Y.) ("*Barrios*") pending in the Eastern District of New York; and, *Jackson v. Pacquiao, et al.*, No. 15-cv-00089 (N.D. Fla.) ("*Jackson*") pending in the Northern District of Florida, (collectively, the "Related Federal Actions"). *See* Schedule of Actions.

As mentioned above, each of the Related Federal Actions is a putative class action, and each alleges substantively similar classes consisting of both nationwide classes and state classes representing the states in which each plaintiff resides. *See Tjaden* Complaint ¶45, (Doc. 1) (alleging a California class consisting of all persons in California that paid money to watch the Fight on pay-per-view, directly, indirectly, via a third-party establishment

showing the pay-per-view)); *Mahoney* Complaint ¶40, (Doc. 1) (alleging a California class); *Vanel* Complaint ¶20, (Doc. 1) (alleging Nationwide class of all persons who paid for tickets to the Fight; purchase pay-per-views showings or made wagers on the Fight); *Neidl* Complaint ¶19, (Doc. 1) (alleging Nationwide class of all persons who purchased a pay-per-view of the Fight); *Gomez* Complaint ¶65 (alleging Nationwide class of all consumers who purchased the Fight on pay-per-view); *Craig* Complaint ¶17, (Doc. 1) (alleging Texas class); *Bobadilla* Complaint ¶17 (alleging a New Jersey class); *Barrios* Complaint ¶45 (alleging a Nationwide class and New York subclass); *Jackson* Complaint ¶19 (alleging a Nationwide class).

Further, the complaints in each of the Related Federal Actions all name both Manny Pacquiao and Top Rank, Inc. as defendants, with substantial overlap between the causes of action: each lawsuit alleges violation of state consumer protection and unfair competition statutes. Further, every action, except *Craig* and *Vanel,* includes a claim for unjust enrichment/money had and received. *Bobadilla* and *Neidl* include implied contractual claims, while *Vanel* includes a claim for fraudulent concealment, and *Gomez* includes a claim for negligent misrepresentation. Each action also prays for similar relief includes damages and declaratory and injunctive relief.

Given the overlapping nature of the Related Federal Actions, Plaintiff believes that centralization before a single judge is appropriate. All of these related actions satisfy the statutory requirements for transfer under Section 1407 because they involve one or more common questions of fact. Transfer of these cases will also be for the convenience of the parties and witnesses, and will promote the just and efficient conduct of these actions. Specifically,

transfer and consolidation of these related cases is appropriate because the cases involve significant common questions of fact concerning the fraudulent nature of defendants' omissions and the deceptive practices surrounding Defendants' promotion and advertising of the Fight. As a result, absent pretrial coordination or consolidation of these cases, defendants and relevant non-parties could potentially be forced to respond to identical discovery responses, seeking the same information and documentation, and to produce the same witnesses for separate depositions in each case. Similarly, absent transfer and coordination or consolidation before a single court, different judges may reach conflicting decisions regarding critical issues—including class certification—which could, in turn, lead to inconsistent results. Transfer and consolidation, thus, would best serve the convenience of the parties and witnesses, and promote the just and efficient conduct of these actions.

Accordingly, Plaintiff respectfully moves this Panel for transfer to the Central District of California, the most favorable district for centralization. The reasons for selecting the Central District of California are: (a) Many of the relevant documents and witnesses are located in the Central District of California; (b) California has the strongest nexus with this litigation; (c) the Central District of California is geographically convenient and easily accessible to all parties and witnesses; (d) the Central District of California has the resources to handle MDL consolidation and is a highly efficient jurisdiction. Accordingly, Plaintiff prays that this Honorable Panel transfer and consolidate the cases referenced in the attached Schedule of Actions to the United States District Court for the Central District of California before the Honorable George H. King for coordinated and/or consolidated pre-trial

proceedings.

## ARGUMENT

A. **THESE ACTIONS AND ANY TAG-ALONG ACTIONS ARE APPROPRIATE FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. §1407(a).**

Transfer and centralization is permitted if civil actions pending in different districts "involv[e] one or more common questions of fact" and this Panel determines that transfer will further "the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. §1407(a). "The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." MANUAL FOR COMPLEX LITIGATION §20.131 (4th ed. 2004). Transfer and centralization for pretrial proceedings would achieve those objectives in the instant litigation, and therefore are appropriate here.

The principal goals of 28 U.S.C. §1407 are best served by transferring the related actions for coordinated pretrial proceedings. 28 U.S.C. §1407 authorizes this Panel to transfer and consolidate two or more civil cases for coordinated pretrial proceedings upon the determination that (i) they "involv[e] one or more common questions of fact," (ii) transfer will further "the convenience of the parties and witnesses," and (iii) transfer "will promote the just and efficient conduct of the action." 28 U.S.C. §1407(a); *In re Cutter Labs, Inc. "Braunwald-Cutter" Aortic Heart Valve Prods. Liab. Litig.*, 465 F. Supp. 1295, 1296 (J.P.M.L. 1979).

Here, Section 1407's requirements for transfer are satisfied. The Related Federal Actions are based on the same or substantially similar

8

questions of law and fact. In addition, transfer will promote the convenience of the parties and efficiency in the pretrial proceedings by eliminating duplicative discovery and the potential for inconsistent rulings, including determinations on class certification. Indeed, because all of the actions assert virtually identical claims and allegations requiring substantial discovery into highly technical aspects of Defendants' sales and marketing procedures, they are ideal candidates for transfer for coordinated or consolidated pretrial proceedings.

### 1. The Related Federal Actions Involve Common, Numerous, and Complex Questions of Fact

Like various other cases, including some involving false advertising, which were recently granted MDL transfer, the Related Federal Actions involve overlapping factual issues in dispute, overlapping class definitions (thus involving a risk of conflicting rulings), no overlap in plaintiffs' counsel, and the same, or substantially the same, defendants.).

Here, the Related Federal Actions are based upon identical facts concerning identical conduct by defendants. Each action concerns the same or substantially similar defendants, the same or substantially similar common course of conduct, arises from substantially the same events, and involves substantively comparable proposed classes. Under similar circumstances, the Panel granted centralization and transfer of *In re: Frito-Lay North America, Inc. "All Natural" Litigation*, which centralized seven actions based on the "same core factual allegation" of false advertising. 908 F. Supp. 2d 1379, 1379-80 (J.P.M.L. 2012); *see also See In re: 5-Hour Energy Mktg. and Sales Practices Litig.*, 949 F. Supp. 2d 1357 (J.P.M.L. 2013) ("5-Hour Energy") ("These actions share factual questions arising out of allegations that [the

9

defendant] used false advertising and deceptive marketing to mislead consumers concerning the benefits of its...product, particularly vis-á-vis [its competitors]."); *In re: Subway Footlong Sandwich Mktg. and Sales Practices Litig.*, 949 F. Supp. 2d 1369 (J.P.M.L. 2013) ("Subway Footlong") ("These seven putative class actions share factual questions arising from plaintiffs' allegation that defendants have engaged in a false or misleading advertising campaign..."). Similarly, plaintiffs' allegations in the actions here will require complex discovery (most likely involving expert testimony) to determine whether the advertising and marketing of the Fight was misleading and unlawful.

2. **MDL Transfer and Centralization Will Further the Convenience of the Parties and the Witnesses and Will Promote the Just and Efficient Conduct of These Actions.**

Resolution of the common issues in a single forum would further the convenience of all parties and witnesses. *See* 28 U.S.C. §1407(a). Because all of the Related Federal Actions involve similar allegations and factual questions, plaintiffs in the actions will require depositions of the same persons and discovery of the same documents. Defendants will likely raise the same discovery objections and seek the same protective orders or privileges in each case. Absent centralization and transfer, all parties will be subjected to duplicative discovery and witnesses will face multiple, redundant depositions. *See Frito Lay, supra*, 908 F. Supp. 2d at 1380 ("Centralization under Section 1407 will eliminate duplicative discovery..."); *In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1230 (J.P.M.L. 1978) ("[Plaintiffs] will have to depose many of the same witnesses, examine many of the same documents, and make many similar pretrial motions in

order to prove their...allegations. The benefits of having a single judge supervise this pretrial activity are obvious.").

Centralization will mitigate these problems by enabling a single judge to manage discovery and the parties to coordinate their efforts. This will reduce litigation costs and minimize inconvenience to the parties and witnesses, to the benefit of litigants, third parties, and the courts. *See In re Enfamil Lipil Mktg. and Sales Practices Litig.*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) ("Centralizing the actions will allow for the efficient resolution of common issues and prevent unnecessary or duplicative pretrial burdens from being placed on the common parties and witnesses."); *Frito Lay, supra*, 908 F. Supp. 2d at 1380 ("Centralization under Section 1407 will...conserve the resources of the parties, their counsel and the judiciary"); *5-Hour Energy, supra*, 949 F. Supp. 2d at 1357 (same); *Subway Footlong, supra*, 949 F. Supp. 2d at 1370 (same). Additionally, many of the same pretrial disputes are likely to arise in each action. Likewise, due to the similar causes of action in each complaint, Defendants will likely assert the same defenses or file motions to dismiss or for summary judgment on the same claims based on the same arguments in each action. Centralization is therefore necessary to prevent inconsistent pretrial rulings on many central issues, which would present significant problems due to the substantial consistency in factual and legal allegations among all four (and soon to be seven) actions. *See 5-Hour Energy, supra*, 949 F. Supp. 2d at 1357 ("Centralization will...prevent inconsistent pretrial rulings, including with respect to class certification...").

In addition, the pending cases plus any tag-along cases that may be

filed are sufficiently numerous (ten already filed in federal court) and geographically diverse (currently pending in six districts). Thus, centralization will promote just and efficient conduct of these actions. *Compare, e.g., Frito-Lay, supra*, 908 F. Supp. 2d 1379 (seven actions pending in five districts); *Subway Footlong, supra*, 949 F. Supp. 2d 1369 (seven actions pending in five districts). By eliminating the risk of duplicative discovery and the corresponding risk of repetitive and inconsistent pretrial rulings, centralization will foster judicial economy and fairness. It will permit the actions to be effectively and efficiently managed while conserving the resources of the parties, attorneys, and judicial system.

**B. THE RELATED ACTIONS SHOULD BE TRANSFERRED TO THE CENTRAL DISTRICT OF CALIFORNIA FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS BEFORE HONORABLE JUDGE GEORGE H. KING**

When a particular harm causes complaints to arise in geographically dispersed areas, and has in fact resulted in a "wide array already of suggested transferee districts, it is clear that any one of a large number of districts would qualify as an appropriate transferee forum[.]" *In re Baycol Prods. Liab. Litig.*, 180 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001). Here, the Central District of California is the most appropriate transferee district based on the fact that:

1) It is the district where the largest number of cases have been filed;

2) It is the district with the largest concentration of Class members;

3) The district has a very strong nexus to the litigation;

4) Is the district in which many of the relevant documents and witnesses are located;

> 5) Defendant Pacquiao resides in the district and has had medical treatment for the subject injury, both before and after the Fight, in the district by physicians who are residents of the district;
>
> 6) Is a major metropolitan court;
>
> 7) Is conveniently located and serviced by a number of major airports;
>
> 8) Is not overtaxed with other multidistrict dockets; and,
>
> 9) Possesses the necessary resources, facilities, and technology to sure-handedly devote the substantial time and effort to pretrial matters that this complex docket is likely to require.

*Id.* As demonstrated by this Panel's decision in *In re Baycol*, when the injuries do not cluster around an injury "epicenter," the questions then become which district is most capable of accommodating all the litigants as a whole, has its door open, and can manage this case efficiently. In this endeavor, the Panel may consider, inter alia, the location of the parties, witnesses and the evidence; the accessibility of the location to all parties and witnesses for travel purposes; the efficiency and resources of the Court to handle the MDL; and the proposed Judge's availability and experience in handling MDLs.

Here, these factors support transfer to the Central District of California. In sum, the Central District of California is the most appropriate forum.

### i. The Central District of California Is the District with the Most Filed Cases

With regard to the number of cases filed across the country, while many of the pending cases are in different districts, the Central District of California has the concentration of the most filed cases with two. *See Tjaden v. Top Rank, Inc., et al.*, No. 15-cv-03419; *Mahoney v. Pacquiao, et al.*, No. 15-cv-3376 (C.D. Cal.). In addition to the two case currently filed in the Central

13

District of California, a third case is expected to be filed on April 8, 2015. As such, this factor is either neutral or favors the Central District of California.

### ii. Most Class Members Reside in California.

As the most populous state in the country, it is believed that the California Class will be the largest. According to the latest U.S. Census, California has approximately 12.2% of the U.S. population.[1] If one reasonably assumes that Defendants' PPV sales for the Fight were distributed proportionally across the country, the largest concentration of Class members and potential witnesses would be in the Central District of California and California. The Central District of California, covering the Los Angeles region a population of 18 million, represents the greatest concentration of Class members in the United States. In turn, this fact further supports consolidation in the Central District of California.

### iii. The Central District of California Has A Strong Nexus to the Litigation

The paramount event involved in this litigation is the undisclosed shoulder injury Manny Pacquiao suffered prior to the Fight, which allegedly was known by the defendants and intentionally hidden from the public, including plaintiffs and members of the various classes. It was this shoulder injury that is at the foundation of every claim presented by the various plaintiffs in the Related Federal Actions. As such, the adjudication of these various related actions will rely on information learned through discovery relating to this shoulder injury. The importance of discovery related to the extent of the shoulder injury, as well as the defendants' knowledge of the

---

[1] http://quickfacts.census.gov/qfd/states/06000.html

14

shoulder injury, leading up to the Fight cannot be overstated in this litigation.

Given the importance the shoulder injury will play in this litigation, the fact that the doctors and surgeons who consulted with Pacquiao prior to his fight, yet subsequent to the relevant shoulder injury, were located in the Central District of California supports Plaintiff's belief that the Central District of California has a strong nexus to the litigation. Specifically, after Manny Pacquiao suffered his shoulder injury during training, he visited doctors and partners in the prestigious Kerlan Jobe Orthopedic Clinic, which has offices located throughout the Central District of California.[2] The information obtained by these doctors and the extent to which that information was provided to defendants will serve as an important piece to this litigation. The fact that this information remains in offices and with witnesses in the Central District of California supports Plaintiff's Motion for consolidation in the Central District of California.

Further, the surgery to repair Manny Pacquiao's shoulder will be performed in the Central District of California by doctors located in the Central District of California.[3] The surgery to repair Manny Pacquiao's shoulder will be performed by Dr. Neal ElAttrache at the Kerlan Jobe Orthopedic Clinic. See Dan Rafael, "Manny Pacquiao Needs Surgery to Fix 'Significant Tear' in Right Shoulder," May 4, 2015, http://espn.go.com/espn/print?id=12821905# ("'The day for the surgery has not been set, but it will take place in Los Angeles,' Pacquiao advisor Michael Koncz said."). Just as

---

[2] http://www.gmanetwork.com/news/story/481662/sports/boxing/full-statement-manny-pacquiao-and-top-rank-on-shoulder-injury
[3] http://www.latimes.com/sports/sportsnow/la-sp-sn-manny-pacquiao-successful-shoulder-surgery-20150506-story.html

15

above, this fact supports Plaintiff's belief that the Central District of California has a strong nexus to the litigation. Transfer and consolidation to a district in which a substantial amount of important evidence is located would be efficient and practical.

> iv. **The Central District of California Is Geographically Convenient to the Evidence, Parties and Witnesses in the Related Actions.**

Keeping in mind that centralization almost always poses an inconvenience to some participants, the Panel should consider the convenience of the parties to the litigation as a whole. *See* 28 U.S.C. §1407(a) (Panel may transfer related actions upon "its determination that transfers...will be for the convenience of the parties and witnesses..."). The Central District of California is located in the City of Los Angeles, California, which is well served as a transportation hub.

The Central District of California is a favorable district given the fact that one of the primary defendants in this case is located and lives in the District and evidence concerning Pacquiao's shoulder injury is located in the District. Manny Pacquiao recently purchased home in Beverly Hills, California, which is located in the Central District of California.[4] Given that each of the plaintiffs in the Related Federal Actions will likely seek to depose Manny Pacquiao, the Central District would be a favorable forum given the convenience such consolidation in that District will serve one of the primary defendants and primary witnesses. Further, as noted above, a majority of the evidence related to Manny Pacquiao's shoulder injury in located in the

---

[4] http://www.forbes.com/sites/redfin/2015/04/01/manny-pacquiao-buys-home-in-beverly-hills/

Central District of California. The Los Angeles based doctors who will perform Pacquiao's surgery and consulted with Pacquiao both before the Fight and after will be primary witnesses in this litigation. As such, the Central District of California serves as a convenient forum to the evidence, parties and witnesses.

Additionally, Los Angeles International Airport is one of the busiest airports in the world, serving 88 airlines through nine terminals. The district is also serviced by airports in Orange County, Burbank, Long Beach, and Ontario. All of these factors support consolidation in the Central District of California.[5]

### v. The Central District of California Is Very Efficient and Has a Favorable Caseload.

As the Panel noted in *In re Phenylpropanolamine (PPA) Products Liab. Litig.*:

> In concluding that the Western District of Washington is the appropriate forum for this docket, we note that centralization in this district permits the Panel to effect the Section 1407 assignment to a major metropolitan court that i) is not currently overtaxed with other multidistrict dockets, and ii) possesses the necessary resources to be able to devote the substantial time and effort to pretrial matters that this complex docket is likely to require.

173 F. Supp. 2d 1377, 1379-80 (J.P.M.L. 2001). The Central District of California has a proven track record in handling its case load expeditiously. Despite facing the highest number of civil cases in the country, the Central District of California takes only an average of 5.3 months for a civil action to proceed from filing to disposition – this places the Central District *1st in the*

---

[5] To the extent additional witnesses and documents are located in Las Vegas, that city is not far and easily accessible by car or plane from Los Angeles with numerous daily flights from the afore-mentioned airports.

*Ninth Circuit and 2th in the nation* in the time it takes to dispose of its total number of cases.[6] Furthermore, while the District has a national reputation as an experienced handler of MDLs, as of March 16, 2015, at present the Central District of California has only 14 MDL consolidations (as opposed to the 17 in the Northern District).[7] The Panel has recognized that a more open MDL docket supports centralization in a particular district. *See, e.g., In re Listerine Total Care Mouthwash Mktg. and Sales Practices Litig.*, 764 F. Supp. 2d 1354, 1355 (J.P.M.L. 2011).

### vi. The Honorable George H. King is the Ideal Transferee Judge.

Judge King is an experienced and capable jurist who is well-qualified to preside over this MDL. Judge King has significant experience handling complex class actions, and is therefore intimately familiar with, and can efficiently handle, issues that are likely to arise in these related actions. Moreover, Judge King is not currently presiding over any pending MDLs.[8]

### vii. In the Alternative The Panel Should Consolidate the Related Federal Actions in the District of Nevada

While still believing the Central District of California to be the most convenient and appropriate forum for consolidation, Plaintiff moves in the alternative for consolidation in the District of Nevada on the grounds that Top Rank, Inc. is based in the district and the Fight that forms the basis of

---

[6] *U.S. District Courts—Median Time Intervals from Filing to Disposition of Civil Cases*, Table C-5, available at http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2014/appendices/C05Sep14.pdf

[7] *MDL Statistics Report – Distribution of Pending MDL Dockets*, October 15, 2014, available at http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-March-16-2015.pdf

[8] http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-March-16-2015.pdf

each complaint took place in the district. As such, evidence and witnesses central to this litigation will be present in the district.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Panel consolidate all related actions pursuant to 28 U.S.C. §1407 and transfer them to the Central District of California.

Respectfully submitted,

ZIMMERMAN REED, PLLP

Dated: May 8, 2015

/s/ *Hart L. Robinovitch*
HART L. ROBINOVITCH
  E-mail: Hart.Robinovitch@zimmreed.com
BRADLEY C. BUHROW
  E-mail: Bard.Buhrow@zimmreed.com
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile

CHRISTOPHER P. RIDOUT
  E-mail: c.ridout@rlollp.com
CALEB MARKER
  E-mail: c.marker@rlollp.com
RIDOUT LYON + OTTOSON, LLP
555 E. Ocean Blvd., Suite 500
Long Beach, CA 90802
(562) 216-7380 Telephone
(562) 216-7385 Facsimile

*Attorneys for Plaintiff Jeremy Tjaden*